(Slip Opinion)     OCTOBER TERM, 2005     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GONZALES, ATTORNEY GENERAL, ET AL. *v.* OREGON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–623.   Argued October 5, 2005—Decided January 17, 2006

The Controlled Substances Act (CSA or Act), which was enacted in
1970 with the main objectives of combating drug abuse and controlling legitimate and illegitimate traffic in controlled substances,
criminalizes, *inter alia*, the unauthorized distribution and dispensation of substances classified in any of its five schedules. The Attorney
General may add, remove, or reschedule substances only after making particular findings, and on scientific and medical matters, he
must accept the findings of the Secretary of Health and Human Services (Secretary). These proceedings must be on the record after an
opportunity for comment. The dispute here involves controlled substances listed in Schedule II, which are generally available only by
written prescription, 21 U. S. C. §829(a). A 1971 regulation promulgated by the Attorney General requires that such prescriptions be
used "for a legitimate medical purpose by an individual practitioner
acting in the usual course of his professional practice." 21 CFR
§1306.04. To prevent diversion of controlled substances, the CSA
regulates the activity of physicians, who must register in accordance
with rules and regulations promulgated by the Attorney General. He
may deny, suspend, or revoke a registration that, as relevant here,
would be "inconsistent with the public interest." 21 U. S. C.
§§824(a)(4), 822(a)(2). In determining consistency with the public interest, he must consider five factors, including the State's recommendation, compliance with state, federal, and local law regarding controlled substances, and "public health and safety." §823(f). The CSA
explicitly contemplates a role for the States in regulating controlled
substances. See §903.

   The Oregon Death With Dignity Act (ODWDA) exempts from civil

or criminal liability state-licensed physicians who, in compliance with ODWDA's specific safeguards, dispense or prescribe a lethal dose of drugs upon the request of a terminally ill patient. In 2001, the Attorney General issued an Interpretive Rule to address the implementation and enforcement of the CSA with respect to ODWDA, declaring that using controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing them for this purpose is unlawful under the CSA. The State, a physician, a pharmacist, and some terminally ill state residents challenged the Rule. The District Court permanently enjoined its enforcement. The Ninth Circuit invalidated the Rule, reasoning that, by making a medical procedure authorized under Oregon law a federal offense, it altered the balance between the States and the Federal Government without the requisite clear statement that the CSA authorized the action; and in the alternative, that the Rule could not be squared with the CSA's plain language, which targets only conventional drug abuse and excludes the Attorney General from medical policy decisions.

*Held:* The CSA does not allow the Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide under state law permitting the procedure. Pp. 8–28.

(a) An administrative rule interpreting the issuing agency's own ambiguous regulation may receive substantial deference. *Auer* v. *Robbins,* 519 U. S. 452, 461–463. So may an interpretation of an ambiguous statute, *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–845, but only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," *United States* v. *Mead Corp.,* 533 U. S. 218, 226–227. Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade." *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140. Pp. 8–9.

(b) The Interpretive Rule at issue is not entitled to *Auer* deference as an interpretation of 21 CFR §1306.04. Unlike the underlying regulations in *Auer,* which gave specificity to a statutory scheme the Secretary of Labor was charged with enforcing and reflected the Labor Department's considerable experience and expertise, the underlying regulation here does little more than restate the terms of the statute itself. The CSA allows prescription of drugs that have a "currently accepted medical use," 21 U. S. C. §812(b); requires a "medical purpose" for dispensing the least controlled substances of those on the schedules, §829(c); and defines a "valid prescription" as one "issued for a legitimate medical purpose," 21 U. S. C. A. §830(b)(3)(A)(ii). Similarly, physicians are considered practitioners if

they dispense controlled substances "in the course of professional practice." 21 U. S. C. §802(21). The regulation just repeats two of these statutory phrases and attempts to summarize the others. An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language. Furthermore, any statutory authority for the Interpretive Rule would have to come from 1984 CSA amendments adding the "public interest" requirement, but 21 CFR §1306.04 was adopted in 1971. That the current interpretation runs counter to the intent at the time of the regulation's promulgation is an additional reason why *Auer* deference is unwarranted. Pp. 9–11.

  (c) The Interpretive Rule is also not entitled to *Chevron* deference. The statutory phrase "legitimate medical purpose" is ambiguous in the relevant sense. However, *Chevron* deference is not accorded merely because the statute is ambiguous and an administrative official is involved. A rule must be promulgated pursuant to authority Congress has delegated to the official. The specific respects in which the Attorney General is authorized to make rules under the CSA show that he is not authorized to make a rule declaring illegitimate a medical standard for patient care and treatment specifically authorized under state law. Congress delegated to the Attorney General only the authority to promulgate rules relating to "registration" and "control" of the dispensing of controlled substances, 21 U. S. C. A. §821, and "for the efficient execution of his [statutory] functions," 21 U. S. C. §871(b). Control means "to add a . . . substance to a schedule," §802(5), following specified procedures. Because the Interpretive Rule does not concern scheduling of substances and was not issued under the required procedures, it cannot fall under the Attorney General's control authority. Even if "control" were understood to signify something other than its statutory definition, it could not support the Interpretive Rule. Nor can the Interpretive Rule be justified under the CSA's registration provisions. It does not undertake the Act's five-factor analysis for determining when registration is "inconsistent with the public interest," §823(f), and it deals with much more than registration. It purports to declare that using controlled substances for physician-assisted suicide is a crime, an authority going well beyond the Attorney General's statutory power to register or deregister physicians. It would be anomalous for Congress to have painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside the course of professional practice and therefore a criminal violation of the CSA. It is not enough that "public interest,"

"public health and safety," and "Federal law" are used in the part of
the Act over which the Attorney General has authority. Cf. *Sutton* v.
*United Air Lines, Inc.,* 527 U. S. 471. The first two terms do not call
on the Attorney General, or any Executive official, to make an inde-
pendent assessment of the meaning of federal law. The Attorney
General did not base the Interpretive Rule on an application of the
five-factor test generally, or the "public health and safety" factor spe-
cifically. Even if he had, it is doubtful that he could cite those factors
to deregister a physician simply because he deemed a controversial
practice permitted by state law to have an illegitimate medical pur-
pose. The federal-law factor requires the Attorney General to decide
"[c]ompliance" with the law but does not suggest that he may decide
what the law is. To say that he can define the substantive standards
of medical practice as part of his authority would also put 21 U. S. C.
§871(b) in considerable tension with the narrowly defined control and
registration delegation. It would go, moreover, against the plain lan-
guage of the text to treat a delegation for the "execution" of his func-
tions as a further delegation to define other functions well beyond the
Act's specific grants of authority. The authority desired by the Gov-
ernment is inconsistent with the Act's design in other fundamental
respects, *e.g.,* the Attorney General must share power with, and in
some respect defer to, the Secretary, whose functions are likewise de-
lineated and confined by the Act. Postenactment congressional com-
mentary on the CSA's regulation of medical practice is also at odds
with the Attorney General's claimed authority. The Government's
claim that the Attorney General's decision is a legal, not medical, one
does not suffice, for the Interpretive Rule places extensive reliance on
medical judgments and views of the medical community in conclud-
ing that assisted suicide is not a legitimate medical purpose. The
idea that Congress gave him such broad and unusual authority
through an implicit delegation is not sustainable. The importance of
the issue of physician-assisted suicide makes the oblique form of the
claimed delegation all the more suspect. Pp. 11–22.

(d) The Attorney General's opinion is unpersuasive under
*Skidmore*. The CSA and this Court's case law amply support the
conclusion that Congress regulates medical practice insofar as it bars
doctors from using their prescription-writing powers as a means to
engage in illicit drug dealing and trafficking as conventionally under-
stood. Beyond this, the Act manifests no intent to regulate the prac-
tice of medicine generally, which is understandable given federal-
ism's structure and limitations. The CSA's structure and operation
presume and rely upon a functioning medical profession regulated
under the States' police powers. The Federal Government can set
uniform standards for regulating health and safety. In connection

Syllabus

with the CSA, however, the only provision in which Congress set general, uniform medical practice standards, 42 U. S. C. §2990bb2a, strengthens the understanding of the CSA as a statute combating recreational drug abuse, and also indicates that when Congress wants to regulate medical practice in the given scheme, it does so by explicit statutory language. The difficulty in defending the Attorney General's declaration that the CSA impliedly criminalizes physician-assisted suicide is compounded by the Act's consistent delegation of medical judgments to the Secretary and its otherwise careful allocation of powers for enforcing the CSA's limited objectives. The Government's contention that the terms "medical" or "medicine" refer to a healing or curative art, and thus cannot embrace the intentional hastening of a patient's death, rests on a reading of 21 U. S. C. §829(a)'s prescription requirement without the illumination of the rest of the statute. Viewed in context, that requirement is better understood as ensuring that patients use controlled substances under a doctor's supervision so as to prevent addiction and recreational abuse. To read prescriptions for assisted suicide as "drug abuse" under the CSA is discordant with the phrase's consistent use throughout the Act, not to mention its ordinary meaning. The Government's interpretation of the prescription requirement also fails under the objection that the Attorney General is an unlikely recipient of such broad authority, given the Secretary's primacy in shaping medical policy under the CSA and the Act's otherwise careful allocation of decisionmaking powers. Pp. 22–28.

368 F. 3d 1118, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–623

ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* OREGON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 17, 2006]

JUSTICE KENNEDY delivered the opinion of the Court.

The question before us is whether the Controlled Substances Act allows the United States Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide, notwithstanding a state law permitting the procedure. As the Court has observed, "Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide." *Washington* v. *Glucksberg*, 521 U. S. 702, 735 (1997). The dispute before us is in part a product of this political and moral debate, but its resolution requires an inquiry familiar to the courts: interpreting a federal statute to determine whether Executive action is authorized by, or otherwise consistent with, the enactment.

In 1994, Oregon became the first State to legalize assisted suicide when voters approved a ballot measure enacting the Oregon Death With Dignity Act (ODWDA). Ore. Rev. Stat. §127.800 *et seq.* (2003). ODWDA, which survived a 1997 ballot measure seeking its repeal, exempts from civil or criminal liability state-licensed physi-

cians who, in compliance with the specific safeguards in ODWDA, dispense or prescribe a lethal dose of drugs upon the request of a terminally ill patient.

The drugs Oregon physicians prescribe under ODWDA are regulated under a federal statute, the Controlled Substances Act (CSA or Act). 84 Stat. 1242, as amended, 21 U. S. C. §801 *et seq.* The CSA allows these particular drugs to be available only by a written prescription from a registered physician. In the ordinary course the same drugs are prescribed in smaller doses for pain alleviation.

A November 9, 2001 Interpretive Rule issued by the Attorney General addresses the implementation and enforcement of the CSA with respect to ODWDA. It determines that using controlled substances to assist suicide is not a legitimate medical practice and that dispensing or prescribing them for this purpose is unlawful under the CSA. The Interpretive Rule's validity under the CSA is the issue before us.

I

A

We turn first to the text and structure of the CSA. Enacted in 1970 with the main objectives of combating drug abuse and controlling the legitimate and illegitimate traffic in controlled substances, the CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules. *Gonzales* v. *Raich*, 545 U. S. ____, ___ (2005) (slip op., at 9–10); 21 U. S. C. §841 (2000 ed. and Supp. II); 21 U. S. C. §844. The Act places substances in one of five schedules based on their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision. Schedule I contains the most severe restrictions on access and use, and Schedule V the least. *Raich*, *supra*, at ___ (slip op., at 11); 21

U. S. C. §812. Congress classified a host of substances when it enacted the CSA, but the statute permits the Attorney General to add, remove, or reschedule substances. He may do so, however, only after making particular findings, and on scientific and medical matters he is required to accept the findings of the Secretary of Health and Human Services (Secretary). These proceedings must be on the record after an opportunity for comment. See 21 U. S. C. A. §811 (main ed. and Supp. 2005).

The present dispute involves controlled substances listed in Schedule II, substances generally available only pursuant to a written, nonrefillable prescription by a physician. 21 U. S. C. §829(a). A 1971 regulation promulgated by the Attorney General requires that every prescription for a controlled substance "be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 CFR §1306.04(a) (2005).

To prevent diversion of controlled substances with medical uses, the CSA regulates the activity of physicians. To issue lawful prescriptions of Schedule II drugs, physicians must "obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him." 21 U. S. C. §822(a)(2). The Attorney General may deny, suspend, or revoke this registration if, as relevant here, the physician's registration would be "inconsistent with the public interest." §824(a)(4); §822(a)(2). When deciding whether a practitioner's registration is in the public interest, the Attorney General "shall" consider:

> "(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.
> "(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

"(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

"(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

"(5) Such other conduct which may threaten the public health and safety." §823(f).

The CSA explicitly contemplates a role for the States in regulating controlled substances, as evidenced by its preemption provision.

"No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision . . . and that State law so that the two cannot consistently stand together." §903.

### B

Oregon voters enacted ODWDA in 1994. For Oregon residents to be eligible to request a prescription under ODWDA, they must receive a diagnosis from their attending physician that they have an incurable and irreversible disease that, within reasonable medical judgment, will cause death within six months. Ore. Rev. Stat. §§127.815, 127.800(12) (2003). Attending physicians must also determine whether a patient has made a voluntary request, ensure a patient's choice is informed, and refer patients to counseling if they might be suffering from a psychological disorder or depression causing impaired judgment. §§127.815, 127.825. A second "consulting" physician must examine the patient and the medical record and confirm the attending physician's conclusions. §127.800(8). Oregon physicians may dispense or issue a prescription for the

requested drug, but may not administer it. §§127.815(L), 127.880.

The reviewing physicians must keep detailed medical records of the process leading to the final prescription, §127.855, records that Oregon's Department of Human Services reviews, §127.865. Physicians who dispense medication pursuant to ODWDA must also be registered with both the State's Board of Medical Examiners and the federal Drug Enforcement Administration (DEA). §127.815(1)(L). In 2004, 37 patients ended their lives by ingesting a lethal dose of medication prescribed under ODWDA. Oregon Dept. of Human Servs., Seventh Annual Report on Oregon's Death with Dignity Act 20 (Mar. 10, 2005).

C

In 1997, Members of Congress concerned about ODWDA invited the DEA to prosecute or revoke the CSA registration of Oregon physicians who assist suicide. They contended that hastening a patient's death is not legitimate medical practice, so prescribing controlled substances for that purpose violates the CSA. Letter from Sen. Orrin Hatch and Rep. Henry Hyde to Thomas A. Constantine (July 25, 1997), reprinted in Hearings on S. 2151 before the Senate Committee on the Judiciary, 105th Cong., 2d Sess., 2–3 (1999) (hereinafter Hearings). The letter received an initial, favorable response from the director of the DEA, see Letter from Thomas A. Constantine to Sen. Orrin Hatch (Nov. 5, 1997), Hearings 4–5, but Attorney General Reno considered the matter and concluded that the DEA could not take the proposed action because the CSA did not authorize it to "displace the states as the primary regulators of the medical profession, or to override a state's determination as to what constitutes legitimate medical practice," Letter from Attorney General Janet Reno to Sen. Orrin Hatch, on Oregon's Death with

Dignity Act (June 5, 1998), Hearings 5–6. Legislation was then introduced to grant the explicit authority Attorney General Reno found lacking; but it failed to pass. See H. R. 4006, 105th Cong., 2d Sess. (1998); H. R. 2260, 106th Cong., 1st Sess. (1999).

In 2001, John Ashcroft was appointed Attorney General. Perhaps because Mr. Ashcroft had supported efforts to curtail assisted suicide while serving as a Senator, see, *e.g.*, 143 Cong. Rec. 5589–5590 (1997) (remarks of Sen. Ashcroft), Oregon Attorney General Hardy Myers wrote him to request a meeting with Department of Justice officials should the Department decide to revisit the application of the CSA to assisted suicide. Letter of Feb. 2, 2001, App. to Brief for Patient-Respondents in Opposition 55a. Attorney General Myers received a reply letter from one of Attorney General Ashcroft's advisers writing on his behalf, which stated

> "I am aware of no pending legislation in Congress that would prompt a review of the Department's interpretation of the CSA as it relates to physician-assisted suicide. Should such a review be commenced in the future, we would be happy to include your views in that review." Letter from Lori Sharpe (Apr. 17, 2001), *id.,* at 58a.

On November 9, 2001, without consulting Oregon or apparently anyone outside his Department, the Attorney General issued an Interpretive Rule announcing his intent to restrict the use of controlled substances for physician-assisted suicide. Incorporating the legal analysis of a memorandum he had solicited from his Office of Legal Counsel, the Attorney General ruled

> "assisting suicide is not a 'legitimate medical purpose' within the meaning of 21 CFR 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the

Controlled Substances Act. Such conduct by a physician registered to dispense controlled substances may 'render his registration . . . inconsistent with the public interest' and therefore subject to possible suspension or revocation under 21 U. S. C. 824(a)(4). The Attorney General's conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted." 66 Fed. Reg. 56608 (2001).

There is little dispute that the Interpretive Rule would substantially disrupt the ODWDA regime. Respondents contend, and petitioners do not dispute, that every prescription filled under ODWDA has specified drugs classified under Schedule II. A physician cannot prescribe the substances without DEA registration, and revocation or suspension of the registration would be a severe restriction on medical practice. Dispensing controlled substances without a valid prescription, furthermore, is a federal crime. See, *e.g.*, 21 U. S. C. §841(a)(1) (2000 ed., Supp. II); *United States* v. *Moore,* 423 U. S. 122 (1975).

In response the State of Oregon, joined by a physician, a pharmacist, and some terminally ill patients, all from Oregon, challenged the Interpretive Rule in federal court. The United States District Court for the District of Oregon entered a permanent injunction against the Interpretive Rule's enforcement.

A divided panel of the Court of Appeals for the Ninth Circuit granted the petitions for review and held the Interpretive Rule invalid. *Oregon* v. *Ashcroft*, 368 F. 3d 1118 (2004). It reasoned that, by making a medical procedure authorized under Oregon law a federal offense, the Interpretive Rule altered the "'"usual constitutional balance between the States and the Federal Government"'" without the requisite clear statement that the CSA authorized

such action.    *Id.,* at 1124–1125 (quoting *Gregory* v. *Ashcroft,* 501 U. S. 452, 460 (1991) (in turn quoting *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242 (1985))).  The Court of Appeals held in the alternative that the Interpretive Rule could not be squared with the plain language of the CSA, which targets only conventional drug abuse and excludes the Attorney General from decisions on medical policy.  368 F. 3d, at 1125–1129.

We granted the Government's petition for certiorari. 543 U. S. 1145 (2005).

## II

Executive actors often must interpret the enactments Congress has charged them with enforcing and implementing.  The parties before us are in sharp disagreement both as to the degree of deference we must accord the Interpretive Rule's substantive conclusions and whether the Rule is authorized by the statutory text at all.  Although balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter, familiar principles guide us.  An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation.  *Auer* v. *Robbins,* 519 U. S. 452, 461–463 (1997).  An interpretation of an ambiguous statute may also receive substantial deference. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–845 (1984).  Deference in accordance with *Chevron*, however, is warranted only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."  *United States* v. *Mead Corp.,* 533 U. S. 218, 226–227 (2001).  Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade."  *Skidmore* v.

*Swift & Co.,* 323 U. S. 134, 140 (1944).

## A

The Government first argues that the Interpretive Rule is an elaboration of one of the Attorney General's own regulations, 21 CFR §1306.04 (2005), which requires all prescriptions be issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." As such, the Government says, the Interpretive Rule is entitled to considerable deference in accordance with *Auer*.

In our view *Auer* and the standard of deference it accords to an agency are inapplicable here. *Auer* involved a disputed interpretation of the Fair Labor Standards Act of 1938 as applied to a class of law enforcement officers. Under regulations promulgated by the Secretary of Labor, an exemption from overtime pay depended, in part, on whether the employees met the "salary basis" test. 519 U. S., at 454–455. In this Court the Secretary of Labor filed an *amicus* brief explaining why, in his view, the regulations gave exempt status to the officers. *Id.,* at 461. We gave weight to that interpretation, holding that because the applicable test was "a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." *Ibid.* (internal quotation marks omitted).

In *Auer*, the underlying regulations gave specificity to a statutory scheme the Secretary was charged with enforcing and reflected the considerable experience and expertise the Department of Labor had acquired over time with respect to the complexities of the Fair Labor Standards Act. Here, on the other hand, the underlying regulation does little more than restate the terms of the statute itself. The language the Interpretive Rule addresses comes from Congress, not the Attorney General, and the near-

equivalence of the statute and regulation belies the Government's argument for *Auer* deference.

The Government does not suggest that its interpretation turns on any difference between the statutory and regulatory language. The CSA allows prescription of drugs only if they have a "currently accepted medical use," 21 U. S. C. §812(b); requires a "medical purpose" for dispensing the least controlled substances of those on the schedules, §829(c); and, in its reporting provision, defines a "valid prescription" as one "issued for a legitimate medical purpose," §830(b)(3)(A)(ii). Similarly, physicians are considered to be acting as practitioners under the statute if they dispense controlled substances "in the course of professional practice." §802(21). The regulation uses the terms "legitimate medical purpose" and "the course of professional practice," *ibid.,* but this just repeats two statutory phrases and attempts to summarize the others. It gives little or no instruction on a central issue in this case: Who decides whether a particular activity is in "the course of professional practice" or done for a "legitimate medical purpose"? Since the regulation gives no indication how to decide this issue, the Attorney General's effort to decide it now cannot be considered an interpretation of the regulation. Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute. An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language.

Furthermore, as explained below, if there is statutory authority to issue the Interpretive Rule it comes from the 1984 amendments to the CSA that gave the Attorney General authority to register and deregister physicians based on the public interest. The regulation was enacted before those amendments, so the Interpretive Rule cannot

be justified as indicative of some intent the Attorney General had in 1971. That the current interpretation runs counter to the "intent at the time of the regulation's promulgation," is an additional reason why *Auer* deference is unwarranted. *Thomas Jefferson Univ.* v. *Shalala,* 512 U. S. 504, 512 (1994) (internal quotation marks omitted). Deference under *Auer* being inappropriate, we turn to the question whether the Interpretive Rule, on its own terms, is a permissible interpretation of the CSA.

### B

Just as the Interpretive Rule receives no deference under *Auer*, neither does it receive deference under *Chevron*. If a statute is ambiguous, judicial review of administrative rulemaking often demands *Chevron* deference; and the rule is judged accordingly. All would agree, we should think, that the statutory phrase "legitimate medical purpose" is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense. *Chevron* deference, however, is not accorded merely because the statute is ambiguous and an administrative official is involved. To begin with, the rule must be promulgated pursuant to authority Congress has delegated to the official. *Mead,* 533 U. S., at 226–227.

The Attorney General has rulemaking power to fulfill his duties under the CSA. The specific respects in which he is authorized to make rules, however, instruct us that he is not authorized to make a rule declaring illegitimate a medical standard for care and treatment of patients that is specifically authorized under state law.

The starting point for this inquiry is, of course, the language of the delegation provision itself. In many cases authority is clear because the statute gives an agency broad power to enforce all provisions of the statute. See, *e.g., National Cable & Telecommunications Assn.* v. *Brand X Internet Services,* 545 U. S. \_\_\_, \_\_\_ (2005) (slip op., at 8)

(explaining that a Federal Communications Commission regulation received *Chevron* deference because "Congress has delegated to the Commission the authority to . . . 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act" (quoting 47 U. S. C. §201(b))); *Household Credit Services, Inc.* v. *Pfennig,* 541 U. S. 232, 238 (2004) (giving *Chevron* deference to a Federal Reserve Board regulation where "Congress has expressly delegated to the Board the authority to prescribe regulations . . . as, in the judgment of the Board, 'are necessary or proper to effectuate the purposes of'" the statute (quoting 15 U. S. C. §1604(a))). The CSA does not grant the Attorney General this broad authority to promulgate rules.

The CSA gives the Attorney General limited powers, to be exercised in specific ways. His rulemaking authority under the CSA is described in two provisions: (1) "The Attorney General is authorized to promulgate rules and regulations and to charge reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances and to listed chemicals," 21 U. S. C. A. §821 (Supp. 2005); and (2) "The Attorney General may promulgate and enforce any rules, regulations, and procedures which he may deem necessary and appropriate for the efficient execution of his functions under this subchapter," 21 U. S. C. §871(b). As is evident from these sections, Congress did not delegate to the Attorney General authority to carry out or effect all provisions of the CSA. Rather, he can promulgate rules relating only to "registration" and "control," and "for the efficient execution of his functions" under the statute.

Turning first to the Attorney General's authority to make regulations for the "control" of drugs, this delegation cannot sustain the Interpretive Rule's attempt to define standards of medical practice. Control is a term of art in the CSA. "As used in this subchapter," §802—the sub-

chapter that includes §821—

> "The term 'control' means to add a drug or other sub-stance, or immediate precursor, to a schedule under part B of this subchapter, whether by transfer from another schedule or otherwise." §802(5).

To exercise his scheduling power, the Attorney General must follow a detailed set of procedures, including re-questing a scientific and medical evaluation from the Secretary. See 21 U. S. C. A. §§811, 812 (main ed. and Supp. 2005). The statute is also specific as to the manner in which the Attorney General must exercise this author-ity: "Rules of the Attorney General under this subsection [regarding scheduling] shall be made on the record after opportunity for a hearing pursuant to the rulemaking procedures prescribed by [the Administrative Procedure Act, 5 U. S. C. §553]." 21 U. S. C. §811(a). The Interpre-tive Rule now under consideration does not concern the scheduling of substances and was not issued after the required procedures for rules regarding scheduling, so it cannot fall under the Attorney General's "control" authority.

Even if "control" in §821 were understood to signify something other than its statutory definition, it would not support the Interpretive Rule. The statutory references to "control" outside the scheduling context make clear that the Attorney General can establish controls "against diversion," *e.g.*, §823(a)(1), but do not give him authority to define diversion based on his view of legitimate medical practice. As explained below, the CSA's express limita-tions on the Attorney General's authority, and other indi-cations from the statutory scheme, belie any notion that the Attorney General has been granted this implicit au-thority. Indeed, if "control" were given the expansive meaning required to sustain the Interpretive Rule, it would transform the carefully described limits on the

Attorney General's authority over registration and sched-
uling into mere suggestions.

We turn, next, to the registration provisions of the CSA.
Before 1984, the Attorney General was required to regis-
ter any physician who was authorized by his State. The
Attorney General could only deregister a physician who
falsified his application, was convicted of a felony relating
to controlled substances, or had his state license or regis-
tration revoked. See 84 Stat. 1255. The CSA was
amended in 1984 to allow the Attorney General to deny
registration to an applicant "if he determines that the
issuance of such registration would be inconsistent with
the public interest." 21 U. S. C. §823(f). Registration may
also be revoked or suspended by the Attorney General on
the same grounds. §824(a)(4). In determining consistency
with the public interest, the Attorney General must, as
discussed above, consider five factors, including: the
State's recommendation; compliance with state, federal,
and local laws regarding controlled substances; and public
health and safety. §823(f).

The Interpretive Rule cannot be justified under this part
of the statute. It does not undertake the five-factor analy-
sis and concerns much more than registration. Nor does
the Interpretive Rule on its face purport to be an applica-
tion of the registration provision in §823(f). It is, instead,
an interpretation of the substantive federal law require-
ments (under 21 CFR §1306.04 (2005)) for a valid pre-
scription. It begins by announcing that assisting suicide is
not a "legitimate medical purpose" under §1306.04, and
that dispensing controlled substances to assist a suicide
violates the CSA. 66 Fed. Reg. 56608 (2001). Violation is
a criminal offense, and often a felony, under 21 U. S. C.
§841 (2000 ed. and Supp. II). The Interpretive Rule thus
purports to declare that using controlled substances for
physician-assisted suicide is a crime, an authority that
goes well beyond the Attorney General's statutory power

to register or deregister.

The Attorney General's deregistration power, of course, may carry implications for criminal enforcement because if a physician dispenses a controlled substance after he is deregistered, he violates §841. The Interpretive Rule works in the opposite direction, however: it declares certain conduct criminal, placing in jeopardy the registration of any physician who engages in that conduct. To the extent the Interpretive Rule concerns registration, it simply states the obvious because one of the five factors the Attorney General must consider in deciding the "public interest" is "[c]ompliance with applicable State, Federal, or local laws relating to controlled substances." 21 U. S. C. §823(f)(4). The problem with the design of the Interpretive Rule is that it cannot, and does not, explain why the Attorney General has the authority to decide what constitutes an underlying violation of the CSA in the first place. The explanation the Government seems to advance is that the Attorney General's authority to decide whether a physician's actions are inconsistent with the "public interest" provides the basis for the Interpretive Rule.

By this logic, however, the Attorney General claims extraordinary authority. If the Attorney General's argument were correct, his power to deregister necessarily would include the greater power to criminalize even the actions of registered physicians, whenever they engage in conduct he deems illegitimate. This power to criminalize—unlike his power over registration, which must be exercised only after considering five express statutory factors—would be unrestrained. It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity outside "the course of professional practice," and therefore a criminal violation of the CSA. See *Federal*

*Maritime Comm'n* v. *Seatrain Lines, Inc.,* 411 U. S. 726, 744 (1973) ("In light of these specific grants of . . . authority, we are unwilling to construe the ambiguous provisions . . . to serve this purpose [of creating further authority]—a purpose for which it obviously was not intended").

   *Sutton* v. *United Air Lines, Inc.,* 527 U. S. 471 (1999), is instructive. The statute at issue was the Americans with Disabilities Act of 1990 (ADA), which, like the CSA, divides interpretive authority among various Executive actors. The Court relied on "the terms and structure of the ADA" to decide that neither the Equal Employment Opportunity Commission, nor any other agency had authority to define "disability" in the ADA. *Id.,* at 479. Specifically, the delegating provision stated that the EEOC "shall issue regulations . . . to carry out this subchapter," 42 U. S. C. §12116, and the section of the statute defining "disability" was in a different subchapter. The Court did not accept the idea that because "the employment subchapter, *i.e.*, '*this* subchapter,' includes other provisions that use the defined terms, . . . [t]he EEOC might elaborate, through regulations, on the meaning of 'disability' . . . if elaboration is needed in order to 'carry out' the substantive provisions of 'this subchapter.'" 527 U. S., at 514 (BREYER, J., dissenting). See also *Adams Fruit Co.* v. *Barrett,* 494 U. S. 638, 649–650 (1990) (holding that a delegation of authority to promulgate motor vehicle safety *"standards"* did not include the authority to decide the pre-emptive scope of the federal statute because "[n]o such delegation regarding [the statute's] enforcement provisions is evident in the statute").

   The same principle controls here. It is not enough that the terms "public interest," "public health and safety," and "Federal law" are used in the part of the statute over which the Attorney General has authority. The statutory terms "public interest" and "public health" do not call on the Attorney General, or any other Executive official, to

make an independent assessment of the meaning of federal law. The Attorney General did not base the Interpretive Rule on an application of the five-factor test generally, or the "public health and safety" factor specifically. Even if he had, it is doubtful the Attorney General could cite the "public interest" or "public health" to deregister a physician simply because he deemed a controversial practice permitted by state law to have an illegitimate medical purpose.

As for the federal law factor, though it does require the Attorney General to decide "[c]ompliance" with the law, it does not suggest that he may decide what the law says. Were it otherwise, the Attorney General could authoritatively interpret "State" and "local laws," which are also included in 21 U. S. C. §823(f), despite the obvious constitutional problems in his doing so. Just as he must evaluate compliance with federal law in deciding about registration, the Attorney General must as surely evaluate compliance with federal law in deciding whether to prosecute; but this does not entitle him to *Chevron* deference. See *Crandon* v. *United States,* 494 U. S. 152, 177 (1990) (SCALIA, J., concurring in judgment) ("The Justice Department, of course, has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference").

The limits on the Attorney General's authority to define medical standards for the care and treatment of patients bear also on the proper interpretation of §871(b). This section allows the Attorney General to best determine how to execute "his functions." It is quite a different matter, however, to say that the Attorney General can define the substantive standards of medical practice as part of his authority. To find a delegation of this extent in §871 would put that part of the statute in considerable tension

with the narrowly defined delegation concerning control and registration. It would go, moreover, against the plain language of the text to treat a delegation for the "execution" of his functions as a further delegation to define other functions well beyond the statute's specific grants of authority. When Congress chooses to delegate a power of this extent, it does so not by referring back to the administrator's functions but by giving authority over the provisions of the statute he is to interpret. See, *e.g., National Cable & Telecommunications Assn.,* 545 U. S. ___; *Household Credit Services,* 541 U. S. 232.

The authority desired by the Government is inconsistent with the design of the statute in other fundamental respects. The Attorney General does not have the sole delegated authority under the CSA. He must instead share it with, and in some respects defer to, the Secretary, whose functions are likewise delineated and confined by the statute. The CSA allocates decisionmaking powers among statutory actors so that medical judgments, if they are to be decided at the federal level and for the limited objects of the statute, are placed in the hands of the Secretary. In the scheduling context, for example, the Secretary's recommendations on scientific and medical matters bind the Attorney General. The Attorney General cannot control a substance if the Secretary disagrees. 21 U. S. C. §811(b). See H. R. Rep. No. 91–1444, pt. 1, p. 33 (1970) (the section "is not intended to authorize the Attorney General to undertake or support medical and scientific research [for the purpose of scheduling], which is within the competence of the Department of Health, Education, and Welfare").

In a similar vein the 1970 Act's regulation of medical practice with respect to drug rehabilitation gives the Attorney General a limited role; for it is the Secretary who, after consultation with the Attorney General and national medical groups, "determine[s] the appropriate methods of professional practice in the medical treatment

of . . . narcotic addiction." 42 U. S. C. §290bb–2a; see 21 U. S. C. §823(g) (2000 ed. and Supp. II) (stating that the Attorney General shall register practitioners who dispense drugs for narcotics treatment when the Secretary has determined the applicant is qualified to treat addicts and the Attorney General has concluded the applicant will comply with record keeping and security regulations); *Moore,* 423 U. S., at 144 (noting that in enacting the addiction-treatment provisions, Congress sought to change the fact "that 'criminal prosecutions' in the past had turned on the opinions of federal prosecutors"); H. R. Rep. No. 93–884, p. 6 (1974) ("This section preserves the distinctions found in the [CSA] between the functions of the Attorney General and the Secretary . . . . All decisions of a medical nature are to be made by the Secretary . . . . Law enforcement decisions respecting the security of stocks of narcotics drugs and the maintenance of records on such drugs are to be made by the Attorney General").

Post enactment congressional commentary on the CSA's regulation of medical practice is also at odds with the Attorney General's claimed authority to determine appropriate medical standards. In 1978, in preparation for ratification of the Convention on Psychotropic Substances, Feb. 21, 1971, [1979–1980] 32 U. S. T. 543, T. I. A. S. No. 9725, Congress decided it would implement the United States' compliance through "the framework of the procedures and criteria for classification of substances provided in the" CSA. 21 U. S. C. §801a(3). It did so to ensure that "nothing in the Convention will interfere with ethical medical practice in this country as determined by [the Secretary] on the basis of a consensus of the views of the American medical and scientific community." *Ibid.*

The structure of the CSA, then, conveys unwillingness to cede medical judgments to an Executive official who lacks medical expertise. In interpreting statutes that divide authority, the Court has recognized: "Because

historical familiarity and policymaking expertise account in the first instance for the presumption that Congress delegates interpretive lawmaking power to the agency rather than to the reviewing court, we presume here that Congress intended to invest interpretive power in the administrative actor in the best position to develop these attributes." *Martin* v. *Occupational Safety and Health Review Comm'n,* 499 U. S. 144, 153 (1991) (citations omitted). This presumption works against a conclusion that the Attorney General has authority to make quintessentially medical judgments.

The Government contends the Attorney General's decision here is a legal, not a medical, one. This generality, however, does not suffice. The Attorney General's Interpretive Rule, and the Office of Legal Counsel memo it incorporates, place extensive reliance on medical judgments and the views of the medical community in concluding that assisted suicide is not a "legitimate medical purpose." See 66 Fed. Reg. 56608 (noting the "medical" distinctions between assisting suicide and giving sufficient medication to alleviate pain); Memorandum from Office of Legal Counsel to Attorney General (June 27, 2001), App. to Pet. for Cert. 121a–122a, and n. 17 (discussing the "Federal medical policy" against physician-assisted suicide), *id.,* at 124a–130a (examining views of the medical community). This confirms that the authority claimed by the Attorney General is both beyond his expertise and incongruous with the statutory purposes and design.

The idea that Congress gave the Attorney General such broad and unusual authority through an implicit delegation in the CSA's registration provision is not sustainable. "Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman* v. *American Trucking Assns., Inc.,* 531 U. S. 457, 468 (2001); see *FDA* v. *Brown & Williamson*

*Tobacco Corp.,* 529 U. S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion").

The importance of the issue of physician-assisted suicide, which has been the subject of an "earnest and profound debate" across the country, *Glucksberg,* 521 U. S., at 735, makes the oblique form of the claimed delegation all the more suspect. Under the Government's theory, moreover, the medical judgments the Attorney General could make are not limited to physician-assisted suicide. Were this argument accepted, he could decide whether any particular drug may be used for any particular purpose, or indeed whether a physician who administers any controversial treatment could be deregistered. This would occur, under the Government's view, despite the statute's express limitation of the Attorney General's authority to registration and control, with attendant restrictions on each of those functions, and despite the statutory purposes to combat drug abuse and prevent illicit drug trafficking.

We need not decide whether *Chevron* deference would be warranted for an interpretation issued by the Attorney General concerning matters closer to his role under the CSA, namely preventing doctors from engaging in illicit drug trafficking. In light of the foregoing, however, the CSA does not give the Attorney General authority to issue the Interpretive Rule as a statement with the force of law.

If, in the course of exercising his authority, the Attorney General uses his analysis in the Interpretive Rule only for guidance in deciding when to prosecute or deregister, then the question remains whether his substantive interpretation is correct. Since the Interpretive Rule was not promulgated pursuant to the Attorney General's authority, its interpretation of "legitimate medical purpose" does not receive *Chevron* deference. Instead, it receives deference only in accordance with *Skidmore.* "The weight of such a

judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U. S., at 140; see also *Mead,* 533 U. S., at 235 (noting that an opinion receiving *Skidmore* deference may "claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight"). The deference here is tempered by the Attorney General's lack of expertise in this area and the apparent absence of any consultation with anyone outside the Department of Justice who might aid in a reasoned judgment. In any event, under *Skidmore*, we follow an agency's rule only to the extent it is persuasive, see *Christensen* v. *Harris County,* 529 U. S. 576, 587 (2000); and for the reasons given and for further reasons set out below, we do not find the Attorney General's opinion persuasive.

## III

As we have noted before, the CSA "repealed most of the earlier antidrug laws in favor of a comprehensive regime to combat the international and interstate traffic in illicit drugs." *Raich*, 545 U. S., at ___ (slip op., at 9). In doing so, Congress sought to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Ibid.* It comes as little surprise, then, that we have not considered the extent to which the CSA regulates medical practice beyond prohibiting a doctor from acting as a drug "'pusher'" instead of a physician. *Moore*, 423 U. S., at 143. In *Moore*, we addressed a situation in which a doctor "sold drugs, not for legitimate purposes, but primarily for the profits to be derived therefrom." *Id.*, at 135 (quoting H. R. Rep. No. 91–1444, pt. 1, at 10; internal quotation marks omitted). There the defendant, who had engaged in large-scale overprescribing of methadone,

"concede[d] in his brief that he did not observe generally accepted medical practices." 423 U. S., at 126. And in *United States* v. *Oakland Cannabis Buyers' Cooperative,* 532 U. S. 483 (2001), Congress' express determination that marijuana had no accepted medical use foreclosed any argument about statutory coverage of drugs available by a doctor's prescription.

In deciding whether the CSA can be read as prohibiting physician-assisted suicide, we look to the statute's text and design. The statute and our case law amply support the conclusion that Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood. Beyond this, however, the statute manifests no intent to regulate the practice of medicine generally. The silence is understandable given the structure and limitations of federalism, which allow the States "'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 475 (1996) (quoting *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 756 (1985)).

The structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the States' police powers. The Attorney General can register a physician to dispense controlled substances "if the applicant is authorized to dispense . . . controlled substances under the laws of the State in which he practices." 21 U. S. C. §823(f). When considering whether to revoke a physician's registration, the Attorney General looks not just to violations of federal drug laws; but he "shall" also consider "[t]he recommendation of the appropriate state licensing board or professional disciplinary authority" and the registrant's compliance with state and local drug laws. *Ibid.* The very definition of a "practitio-

ner" eligible to prescribe includes physicians "licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices" to dispense controlled substances. §802(21). Further cautioning against the conclusion that the CSA effectively displaces the States' general regulation of medical practice is the Act's pre-emption provision, which indicates that, absent a positive conflict, none of the Act's provisions should be "construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State." §903.

Oregon's regime is an example of the state regulation of medical practice that the CSA presupposes. Rather than simply decriminalizing assisted suicide, ODWDA limits its exercise to the attending physicians of terminally ill patients, physicians who must be licensed by Oregon's Board of Medical Examiners. Ore. Rev. Stat. §§127.815, 127.800(10) (2003). The statute gives attending physicians a central role, requiring them to provide prognoses and prescriptions, give information about palliative alternatives and counseling, and ensure patients are competent and acting voluntarily. §127.815. Any eligible patient must also get a second opinion from another registered physician, §127.820, and the statute's safeguards require physicians to keep and submit to inspection detailed records of their actions, §§127.855, 127.865.

Even though regulation of health and safety is "primarily, and historically, a matter of local concern," *Hillsborough County* v. *Automated Medical Laboratories, Inc.,* 471 U. S. 707, 719 (1985), there is no question that the Federal Government can set uniform national standards in these areas. See *Raich, supra,* at ___ (slip op., at 6). In connection to the CSA, however, we find only one area in which Congress set general, uniform standards of medical prac-

tice. Title I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, of which the CSA was Title II, provides that

> "[The Secretary], after consultation with the Attorney General and with national organizations representative of persons with knowledge and experience in the treatment of narcotic addicts, shall determine the appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts, and shall report thereon from time to time to the Congress." §4, 84 Stat. 1241, codified at 42 U. S. C. §290bb–2a.

This provision strengthens the understanding of the CSA as a statute combating recreational drug abuse, and also indicates that when Congress wants to regulate medical practice in the given scheme, it does so by explicit language in the statute.

In the face of the CSA's silence on the practice of medicine generally and its recognition of state regulation of the medical profession it is difficult to defend the Attorney General's declaration that the statute impliedly criminalizes physician-assisted suicide. This difficulty is compounded by the CSA's consistent delegation of medical judgments to the Secretary and its otherwise careful allocation of powers for enforcing the limited objects of the CSA. See Part II–B, *supra*. The Government's attempt to meet this challenge rests, for the most part, on the CSA's requirement that every Schedule II drug be dispensed pursuant to a "written prescription of a practitioner." 21 U. S. C. §829(a). A prescription, the Government argues, necessarily implies that the substance is being made available to a patient for a legitimate medical purpose. The statute, in this view, requires an anterior judgment about the term "medical" or "medicine." The Government contends ordinary usage of these words ineluctably refers

to a healing or curative art, which by these terms cannot embrace the intentional hastening of a patient's death. It also points to the teachings of Hippocrates, the positions of prominent medical organizations, the Federal Government, and the judgment of the 49 States that have not legalized physician-assisted suicide as further support for the proposition that the practice is not legitimate medicine. See Brief for Petitioners 22–24; Memorandum from Office of Legal Counsel to Attorney General, App. to Pet. for Cert. 124a–130a.

On its own, this understanding of medicine's boundaries is at least reasonable. The primary problem with the Government's argument, however, is its assumption that the CSA impliedly authorizes an Executive officer to bar a use simply because it may be inconsistent with one reasonable understanding of medical practice. Viewed alone, the prescription requirement may support such an understanding, but statutes "should not be read as a series of unrelated and isolated provisions." *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 570 (1995). The CSA's substantive provisions and their arrangement undermine this assertion of an expansive federal authority to regulate medicine.

The statutory criteria for deciding what substances are controlled, determinations which are central to the Act, consistently connect the undefined term "drug abuse" with addiction or abnormal effects on the nervous system. When the Attorney General schedules drugs, he must consider a substance's psychic or physiological dependence liability. 21 U. S. C. §811(c)(7). To classify a substance in Schedules II through V, the Attorney General must find abuse of the drug leads to psychological or physical dependence. §812(b). Indeed, the differentiation of Schedules II through V turns in large part on a substance's habit-forming potential: The more addictive a substance, the stricter the controls. *Ibid.* When Congress wanted to

extend the CSA's regulation to substances not obviously habit forming or psychotropic, moreover, it relied not on Executive ingenuity, but rather on specific legislation. See §1902(a) of the Anabolic Steroids Control Act of 1990, 104 Stat. 4851 (placing anabolic steroids in Schedule III).

The statutory scheme with which the CSA is intertwined further confirms a more limited understanding of the prescription requirement. When the Secretary considers FDA approval of a substance with "stimulant, depressant, or hallucinogenic effect," he must forward the information to the Attorney General for possible scheduling. Shedding light on Congress' understanding of drug abuse, this requirement appears under the heading "Abuse potential." 21 U. S. C. §811(f). Similarly, when Congress prepared to implement the Convention on Psychotropic Substances, it did so through the CSA. §801a.

The Interpretive Rule rests on a reading of the prescription requirement that is persuasive only to the extent one scrutinizes the provision without the illumination of the rest of the statute. See *Massachusetts* v. *Morash,* 490 U. S. 107, 114–115 (1989). Viewed in its context, the prescription requirement is better understood as a provision that ensures patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse. As a corollary, the provision also bars doctors from peddling to patients who crave the drugs for those prohibited uses. See *Moore,* 423 U. S., at 135, 143. To read prescriptions for assisted suicide as constituting "drug abuse" under the CSA is discordant with the phrase's consistent use throughout the statute, not to mention its ordinary meaning.

The Government's interpretation of the prescription requirement also fails under the objection that the Attorney General is an unlikely recipient of such broad authority, given the Secretary's primacy in shaping medical policy under the CSA, and the statute's otherwise careful alloca-

tion of decisionmaking powers. Just as the conventions of expression indicate that Congress is unlikely to alter a statute's obvious scope and division of authority through muffled hints, the background principles of our federal system also belie the notion that Congress would use such an obscure grant of authority to regulate areas traditionally supervised by the States' police power. It is unnecessary even to consider the application of clear statement requirements, see, *e.g.*, *United States* v. *Bass,* 404 U. S. 336, 349 (1971); cf. *BFP* v. *Resolution Trust Corporation,* 511 U. S. 531, 544–546 (1994), or presumptions against preemption, see, *e.g.*, *Rush Prudential HMO, Inc.* v. *Moran,* 536 U. S. 355, 387 (2002), to reach this commonsense conclusion. For all these reasons, we conclude the CSA's prescription requirement does not authorize the Attorney General to bar dispensing controlled substances for assisted suicide in the face of a state medical regime permitting such conduct.

## IV

The Government, in the end, maintains that the prescription requirement delegates to a single Executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality. The text and structure of the CSA show that Congress did not have this far-reaching intent to alter the federal-state balance and the congressional role in maintaining it.

The judgment of the Court of Appeals is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

No. 04–623

ALBERTO R. GONZALES, ATTORNEY GENERAL,
ET AL., PETITIONERS *v.* OREGON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 17, 2006]

JUSTICE SCALIA, with whom CHIEF JUSTICE ROBERTS
and JUSTICE THOMAS join, dissenting.

The Court concludes that the Attorney General lacked
authority to declare assisted suicide illicit under the Con-
trolled Substances Act (CSA), because the CSA is con-
cerned only with "*illicit* drug dealing and trafficking,"
*ante*, at 23 (emphasis added). This question-begging
conclusion is obscured by a flurry of arguments that dis-
tort the statute and disregard settled principles of our
interpretive jurisprudence.

Contrary to the Court's analysis, this case involves not
one but *three* independently sufficient grounds for revers-
ing the Ninth Circuit's judgment. First, the Attorney
General's interpretation of "legitimate medical purpose" in
21 CFR §1306.04 (2005) (hereinafter Regulation) is clearly
valid, given the substantial deference we must accord it
under *Auer* v. *Robbins*, 519 U. S. 452, 461 (1997), and his
two remaining conclusions follow naturally from this
interpretation. See Part I, *infra*. Second, even if this
interpretation of the Regulation is entitled to lesser defer-
ence or no deference at all, it is by far the most natural
interpretation of the Regulation—whose validity is not
challenged here. This interpretation is thus correct even
upon *de novo* review. See Part II, *infra*. Third, even if
that interpretation of the Regulation were incorrect, the

Attorney General's independent interpretation of the *statutory* phrase "public interest" in 21 U. S. C. §§824(a) and 823(f), and his implicit interpretation of the statutory phrase "public health and safety" in §823(f)(5), are entitled to deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), and they are valid under *Chevron.* See Part III, *infra.* For these reasons, I respectfully dissent.

I

The Interpretive Rule issued by the Attorney General (hereinafter Directive) provides in relevant part as follows:

> "For the reasons set forth in the OLC Opinion, I hereby determine that assisting suicide is not a 'legitimate medical purpose' within the meaning of 21 CFR §1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the CSA. Such conduct by a physician registered to dispense controlled substances may 'render his registration . . . inconsistent with the public interest' and therefore subject to possible suspension or revocation under 21 U. S. C. [§]824(a)(4)." 66 Fed. Reg. 56608 (2001).

The Directive thus purports to do three distinct things: (1) to interpret the phrase "legitimate medical purpose" in the Regulation to exclude physician-assisted suicide; (2) to determine that prescribing, dispensing, and administering federally controlled substances to assist suicide violates the CSA; and (3) to determine that participating in physician-assisted suicide may render a practitioner's registration "inconsistent with the public interest" within the meaning of 21 U. S. C. §§823(f) and 824(a)(4) (which incorporates §823(f) by reference). The Court's analysis suffers from an unremitting failure to distinguish among these distinct propositions in the Directive.

As an initial matter, the validity of the Regulation's interpretation of "prescription" in §829 to require a "legitimate medical purpose" is not at issue. Respondents conceded the validity of this interpretation in the lower court, see *Oregon* v. *Ashcroft*, 368 F. 3d 1118, 1133 (CA9 2004), and they have not challenged it here. By its assertion that the Regulation merely restates the statutory standard of 21 U. S. C. §830(b)(3)(A)(ii), see *ante*, at 10, the Court likewise accepts that the "legitimate medical purpose" interpretation for prescriptions is proper. See also *ante*, at 11 (referring to "legitimate medical purpose" as a "statutory phrase"). It is beyond dispute, then, that a "prescription" under §829 must issue for a "legitimate medical purpose."

### A

Because the Regulation was promulgated by the Attorney General, and because the Directive purported to interpret the language of the Regulation, see 66 Fed. Reg. 56608, this case calls for the straightforward application of our rule that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, *supra*, at 461 (internal quotation marks omitted). The Court reasons that *Auer* is inapplicable because the Regulation "does little more than restate the terms of the statute itself." *Ante*, at 9. "Simply put," the Court asserts, "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." *Ante*, at 10.

To begin with, it is doubtful that any such exception to the *Auer* rule exists. The Court cites no authority for it, because there is none. To the contrary, our unanimous decision in *Auer* makes clear that broadly drawn regulations are entitled to no less respect than narrow ones. "A rule requiring the Secretary to construe his own regula-

tions narrowly would make little sense, *since he is free to write the regulations as broadly as he wishes, subject only to the limits imposed by the statute.*"  519 U. S., at 463 (emphasis added).

Even if there were an antiparroting canon, however, it would have no application here.  The Court's description of 21 CFR §1306.04 (2005) as a regulation that merely "paraphrase[s] the statutory language," *ante*, at 10, is demonstrably false.  In relevant part, the Regulation interprets the word "prescription" as it appears in 21 U. S. C. §829, which governs the dispensation of controlled substances other than those on Schedule I (which may not be dispensed at all).  Entitled "[p]rescriptions," §829 requires, with certain exceptions not relevant here, "the written prescription of a practitioner" (usually a medical doctor) for the dispensation of Schedule II substances (§829(a)), "a written or oral prescription" for substances on Schedules III and IV (§829(b)), and no prescription but merely a "medical purpose" for the dispensation of Schedule V substances (§829(c)).

As used in this section, "prescription" is susceptible of at least three reasonable interpretations.  First, it might mean any oral or written direction of a practitioner for the dispensation of drugs.  See *United States* v. *Moore*, 423 U. S. 122, 137, n. 13 (1975) ("On its face §829 addresses only the form that a prescription must take. . . .  [Section] 829 by its terms does not limit the authority of a practitioner").  Second, in light of the requirement of a "medical purpose" for the dispensation of Schedule V substances, see §829(c), it might mean a practitioner's oral or written direction for the dispensation of drugs that the practitioner believes to be for a legitimate medical purpose.  See Webster's New International Dictionary 1954 (2d ed. 1950) (hereinafter Webster's Second) (defining "prescription" as "[a] written direction for the preparation and use of a *medicine*"); *id.*, at 1527 (defining "medicine" as "[a]ny

substance or preparation used in *treating disease*") (emphases added). Finally, "prescription" might refer to a practitioner's direction for the dispensation of drugs that serves an *objectively* legitimate medical purpose, regardless of the practitioner's *subjective* judgment about the legitimacy of the anticipated use. See *ibid.*

The Regulation at issue constricts or clarifies the statute by adopting the last and narrowest of these three possible interpretations of the undefined statutory term: "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose . . . ." 21 CFR §1306.04(a) (2005). We have previously *acknowledged* that the Regulation gives added content to the text of the statute: "The medical purpose requirement explicit in subsection (c) [of §829] could be implicit in subsections (a) and (b). Regulation §[1]306.04 makes it explicit." *Moore*, *supra*, at 137, n. 13.[1]

The Court points out that the Regulation adopts some of the phrasing employed in unrelated sections of the statute. See *ante*, at 10. This is irrelevant. A regulation that significantly clarifies the meaning of an otherwise ambiguous statutory provision is not a "parroting" regulation, *regardless* of the sources that the agency draws upon for the clarification. Moreover, most of the statutory phrases that the Court cites as appearing in the Regulation, see *ibid.* (citing 21 U. S. C. §§812(b) ("'currently accepted medical use'"), 829(c) ("'medical purpose'"), 802(21) ("'in the course of professional practice'")), are inapposite be-

---

[1] To be sure, this acknowledgment did not go far enough, because it overlooked the significance of the word "legitimate," which is most naturally understood to create an objective, *federal* standard for appropriate medical uses. See *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 43 (1989) ("We start . . . with the general assumption that in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law" (internal quotation marks omitted)).

cause they do *not* "parrot" the *only* phrase in the Regula-
tion that the Directive purported to construe.  See 66 Fed.
Reg. 56608 ("I hereby determine that assisting suicide is
not a 'legitimate medical purpose' within the meaning of
21 CFR §1306.04 . . .").  None of them includes the key
word "legitimate," which gives the most direct support to
the Directive's theory that §829(c) presupposes a uniform
federal standard of medical practice.[2]

   Since the Regulation does not run afowl (so to speak) of
the Court's newly invented prohibition of "parroting"; and
since the Directive represents the agency's own interpre-
tation of that concededly valid regulation; the only ques-
tion remaining is whether that interpretation is "plainly
erroneous or inconsistent with the regulation"; otherwise,
it is "controlling."  *Auer*, *supra*, at 461 (internal quotation
marks omitted).  This is not a difficult question.  The
Directive is assuredly valid insofar as it interprets "pre-
scription" to require a medical purpose that is "legitimate"
as a matter of *federal* law—since that is an interpretation
of "prescription" that we ourselves have adopted.  *Webb* v.
*United States*, 249 U. S. 96 (1919), was a prosecution

———————
   [2] The only place outside 21 U. S. C. §801 in which the statute uses the
phrase "legitimate medical purpose" is in defining the phrase "valid
prescription" for purposes of the reporting requirements that apply to
mail orders of regulated substances.  See §830(b)(3)(A)(ii).  The Regula-
tion did not "parrot" this statutory section, because the Regulation was
adopted in 1971 and the statutory language was added in 2000.  See
Brief for Petitioners 17 (citing the Children's Health Act of 2000, §3652,
114 Stat. 1239, 21 U. S. C. §830(b)(3)).  But even if the statutory lan-
guage had predated the Regulation, there would be no "parroting" of
that phrase.  In using the word "prescription" *without* definition in the
much more critical §829, Congress left the task of resolving any ambi-
guity in that word, used in that context, to the relevant Executive
officer.  That the officer did so by deeming relevant a technically
inapplicable statutory definition contained elsewhere in the statute
does not make him a parrot.  He has given to the statutory text a
meaning it did not explicitly—and perhaps even not necessarily—
contain.

under the Harrison Act of a doctor who wrote prescriptions of morphine "for the purpose of providing the user with morphine sufficient to keep him comfortable by maintaining his customary use," *id.*, at 99. The dispositive issue in the case was whether such authorizations were "prescriptions" within the meaning of §2(b) of the Harrison Act, predecessor to the CSA. *Ibid.* We held that "to call such an order for the use of morphine a physician's prescription would be so plain a perversion of meaning that no discussion of the subject is required." *Id.*, at 99–100. Like the Directive, this interprets "prescription" to require medical purpose that is legitimate as a matter of federal law. And the Directive is also assuredly valid insofar as it interprets "legitimate medical purpose" as a matter of federal law to exclude physician-assisted suicide, because that is not only a permissible but indeed the most natural interpretation of that phrase. See Part II, *infra.*

B

Even if the Regulation merely parroted the statute, and the Directive therefore had to be treated as though it construed the statute directly, see *ante*, at 11, the Directive would still be entitled to deference under *Chevron.* The Court does not take issue with the Solicitor General's contention that no alleged procedural defect, such as the absence of notice-and-comment rulemaking before promulgation of the Directive, renders *Chevron* inapplicable here. See Reply Brief for Petitioners 4 (citing *Barnhart* v. *Walton*, 535 U. S. 212, 219–222 (2002); 5 U. S. C. §553(b)(3)(A) (exempting interpretive rules from notice-and-comment rulemaking)). Instead, the Court holds that the Attorney General lacks interpretive authority to issue the Directive at all, on the ground that the explicit delegation provision, 21 U. S. C. A. §821 (Supp. 2005), limits his rulemaking authority to "registration and control," which (according to the Court) are not implicated by the Directive's interpreta-

tion of the prescription requirement. See *ante*, at 12–14.

Setting aside the implicit delegation inherent in Congress's use of the undefined term "prescription" in §829, the Court's reading of "control" in §821 is manifestly erroneous. The Court urges, *ante*, at 12–13, that "control" is a term defined in part A of the subchapter (entitled "Introductory Provisions") to mean "to add a drug or other substance . . . to a schedule *under part B of this subchapter*," 21 U. S. C. §802(5) (emphasis added). But §821 is not included in "part B of this subchapter," which is entitled "Authority to Control; Standards and Schedules," and consists of the sections related to *scheduling*, 21 U. S. C. A. §§811–814 (main ed. and Supp. 2005), where the statutory definition is uniquely appropriate. Rather, §821 is found in *part C* of the subchapter, §§821–830, entitled "Registration of Manufacturers, Distributors, and Dispensers of Controlled Substances," which includes all and only the provisions relating to the "manufacture, distribution, and dispensing of controlled substances," §821. The artificial definition of "control" in §802(5) has no conceivable application to the use of that word in §821. Under that definition, "control" must take a *substance* as its direct object, see 21 U. S. C. §802(5) ("to add a drug or other substance . . . to a schedule")—and that is how "control" is consistently used throughout *part B*. See, *e.g.*, §§811(b) ("proceedings . . . to *control* a drug or other substance"), 811(c) ("each drug or other substance proposed to be *controlled* or removed from the schedules"), 811(d)(1) ("If *control* is required . . . the Attorney General shall issue an order *controlling* such drug . . ."), 812(b) ("Except where *control* is required . . . a drug or other substance may not be placed in any schedule . . ."). In §821, by contrast, the term "control" has as its object, not "a drug or other substance," but rather the *processes* of "manufacture, distribution, and dispensing of controlled substances." It could not be clearer that the artificial definition of "control" in

§802(5) is inapplicable. It makes no sense to speak of "adding the manufacturing, distribution, and dispensing of substances to a schedule." We do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense. What is obviously intended in §821 is the ordinary meaning of "control"—namely, "[t]o exercise restraining or directing influence over; to dominate; regulate; hence, to hold from action; to curb," Webster's Second 580. "Control" is regularly used in this ordinary sense elsewhere in *part C* of the subchapter. See, *e.g.*, 21 U. S. C. §§823(a)(1), (b)(1), (d)(1), (e)(1), (h)(1) ("maintenance of effective *controls* against diversion"); §§823(a)(5), (d)(5) ("establishment of effective *control* against diversion"); §823(g)(2)(H)(i) ("to exercise supervision or *control* over the practice of medicine"); §830(b)(1)(C) ("a listed chemical under the *control* of the regulated person"); §830(c)(2)(D) ("chemical *control* laws") (emphases added).

When the word is given its ordinary meaning, the Attorney General's interpretation of the prescription requirement of §829 plainly "relat[es] to the . . . *control* of the . . . dispensing of controlled substances," 21 U. S. C. A. §821 (Supp. 2005) (emphasis added), since a prescription is the chief requirement for "dispensing" such drugs, see §829. The same meaning is compelled by the fact that §821 is the first section not of part B of the subchapter, which deals entirely with "control" in the artificial sense, but of part C, every section of which relates to the "registration and control of the manufacture, distribution, and dispensing of controlled substances," §821. See §§822 (persons required to register), 823 (registration requirements), 824 (denial, revocation, or suspension of registration), 825 (labeling and packaging), 826 (production quotas for controlled substances), 827 (recordkeeping and reporting requirements of registrants), 828 (order forms), 829 (prescription requirements), 830 (regulation of listed chemicals and certain machines). It would be peculiar for

the first section of this part to authorize rulemaking for matters covered by the *previous* part. The only sensible interpretation of §821 is that it gives the Attorney General interpretive authority over the provisions of part C, all of which "relat[e] to the registration and control of the manufacture, distribution, and dispensing of controlled substances." These provisions include *both* the prescription requirement of §829, and the criteria for registration and deregistration of §§823 and 824 (as relevant below, see Part III, *infra*).[3]

C

In sum, the Directive's construction of "legitimate medical purpose" is a perfectly valid agency interpretation of its own regulation; and if not that, a perfectly valid agency interpretation of the statute. No one contends that the construction is "plainly erroneous or inconsistent with the regulation," *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945), or beyond the scope of ambiguity in the statute, see *Chevron*, 467 U. S., at 843. In fact, as

---

[3] The Court concludes that "[e]ven if 'control' in §821 were understood to signify something other than its statutory definition, it would not support the Interpretive Rule." *Ante*, at 13. That conclusion rests upon a misidentification of the text that the Attorney General, pursuant to his "control" authority, is interpreting. No one argues that the word "control" in §821 gives the Attorney General "authority to define diversion based on his view of legitimate medical practice," *ibid*. Rather, that word authorizes the Attorney General to interpret (among other things) the "prescription" requirement of §829. The question then becomes whether the phrase "*legitimate medical purpose*" (which all agree is included in "prescription") is at least *open* to the interpretation announced in the Directive. See *Chevron U. S. A. Inc.*, v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984). And of course it is—as the Court effectively concedes two pages earlier: "All would agree, we should think, that the statutory phrase 'legitimate medical purpose' is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense." *Ante*, at 11 (citing *Chevron*).

explained below, the Directive provides *the most natural* interpretation of the Regulation and of the statute. The Directive thus definitively establishes that a doctor's order authorizing the dispensation of a Schedule II substance for the purpose of assisting a suicide is not a "prescription" within the meaning of §829.

Once this conclusion is established, the other two conclusions in the Directive follow inevitably. Under our reasoning in *Moore*, writing prescriptions that are illegitimate under §829 is certainly not "in the [usual] course of professional practice" under §802(21) and thus not "authorized by this subchapter" under §841(a). See 423 U. S., at 138, 140–141. A doctor who does this may thus be prosecuted under §841(a), and so it follows that such conduct "violates the Controlled Substances Act," 66 Fed. Reg. 56608. And since such conduct is thus not in "[c]ompliance with applicable . . . Federal . . . laws relating to controlled substances," 21 U. S. C. §823(f)(4), and may also be fairly judged to "threaten the public health and safety," §823(f)(5), it follows that "[s]uch conduct by a physician registered to dispense controlled substances *may* 'render his registration . . . inconsistent with the public interest' and therefore subject to *possible* suspension or revocation under 21 U. S. C. [§]824(a)(4)." 66 Fed. Reg. 56608 (emphases added).

## II

Even if the Directive were entitled to no deference whatever, the most reasonable interpretation of the Regulation and of the statute would produce the same result. Virtually every relevant source of authoritative meaning confirms that the phrase "legitimate medical purpose"[4]

––––––––––

[4] This phrase appears only in the Regulation and not in the relevant section of the statute. But as pointed out earlier, the Court does not contest that this is the most reasonable interpretation of the section— regarding it, indeed, as a mere "parroting" of the statute.

does not include intentionally assisting suicide. "Medicine" refers to "[t]he science and art dealing with the prevention, cure, or alleviation of disease." Webster's Second 1527. The use of the word "legitimate" connotes an *objective* standard of "medicine," and our presumption that the CSA creates a uniform federal law regulating the dispensation of controlled substances, see *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 43 (1989), means that this objective standard must be a federal one. As recounted in detail in the memorandum for the Attorney General that is attached as an appendix to the Directive (OLC Memo), virtually every medical authority from Hippocrates to the current American Medical Association (AMA) confirms that assisting suicide has seldom or never been viewed as a form of "prevention, cure, or alleviation of disease," and (even more so) that assisting suicide is not a "legitimate" branch of that "science and art." See OLC Memo, App. to Pet. for Cert. 113a–130a. Indeed, the AMA has determined that "'[p]hysician-assisted suicide is fundamentally incompatible with the physician's role as a healer.'" *Washington* v. *Glucksberg*, 521 U. S. 702, 731 (1997). "[T]he overwhelming weight of authority in judicial decisions, the past and present policies of nearly all of the States and of the Federal Government, and the clear, firm and unequivocal views of the leading associations within the American medical and nursing professions, establish that assisting in suicide . . . is not a legitimate medical purpose." OLC Memo, *supra*, at 129a. See also *Glucksberg*, *supra*, at 710, n. 8 (prohibitions or condemnations of assisted suicide in 50 jurisdictions, including 47 States, the District of Columbia, and 2 Territories).

In the face of this "overwhelming weight of authority," the Court's admission that "[o]n its own, this understanding of medicine's boundaries is *at least reasonable*," *ante*, at 26 (emphasis added), tests the limits of understate-

ment. The only explanation for such a distortion is that the Court confuses the *normative* inquiry of what the boundaries of medicine *should be*—which it is laudably hesitant to undertake—with the *objective* inquiry of what the accepted definition of "medicine" *is*. The same confusion is reflected in the Court's remarkable statement that "[t]he primary problem with the Government's argument . . . is its assumption that the CSA impliedly authorizes an Executive officer to bar a use simply because it may be inconsistent with *one reasonable understanding* of medical practice." *Ibid.* (emphasis added). The fact that many in Oregon believe that the boundaries of "legitimate medicine" *should be* extended to include assisted suicide does not change the fact that the overwhelming weight of authority (including the 47 States that condemn physician-assisted suicide) confirms that they have not yet been so extended. Not even those of our Eighth Amendment cases most generous in discerning an "evolution" of national standards would have found, on this record, that the concept of "legitimate medicine" has evolved so far. See *Roper* v. *Simmons*, 543 U. S. 551, 564–567 (2005).

The Court contends that the phrase "legitimate medical purpose" *cannot* be read to establish a broad, uniform federal standard for the medically proper use of controlled substances. *Ante*, at 22. But it also rejects the most plausible alternative proposition, urged by the State, that any use authorized under state law constitutes a "legitimate medical purpose." (The Court is perhaps leery of embracing this position because the State candidly admitted at oral argument that, on its view, a State could exempt from the CSA's coverage the use of morphine to achieve euphoria.) Instead, the Court reverse-engineers an approach somewhere between a uniform national standard and a state-by-state approach, holding (with no basis in the CSA's text) that "legitimate medical purpose" refers to *all* uses of drugs unrelated to "addiction and recreational

abuse." *Ante*, at 27. Thus, though the Court pays lipser-
vice to state autonomy, see *ante*, 23–24, its standard for
"legitimate medical purpose" is in fact a hazily defined
*federal* standard based on its purposive reading of the
CSA, and extracted from obliquely relevant sections of the
Act. In particular, relying on its observation that the
criteria for scheduling controlled substances are primarily
concerned with "addiction or abnormal effects on the
nervous system," *ante*, at 26–27 (citing 21 U. S. C.
§§811(c)(7), 812(b), 811(f), 801a), the Court concludes that
the CSA's prescription requirement must be interpreted in
light of this narrow view of the statute's purpose.

Even assuming, however, that the *principal* concern of
the CSA is the curtailment of "addiction and recreational
abuse," there is no reason to think that this is its *exclusive*
concern. We have repeatedly observed that Congress often
passes statutes that sweep more broadly than the main
problem they were designed to address. "[S]tatutory
prohibitions often go beyond the principal evil to cover
reasonably comparable evils, and it is ultimately the
provisions of our laws rather than the principal concerns
of our legislators by which we are governed." *Oncale* v.
*Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79 (1998).
See also *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492
U. S. 229, 248 (1989).

The scheduling provisions of the CSA on which the
Court relies confirm that the CSA's "design," *ante*, at 23, is
not as narrow as the Court asserts. In making scheduling
determinations, the Attorney General must not only con-
sider a drug's "psychic or physiological dependence liabil-
ity" as the Court points out, *ante*, at 26 (citing 21 U. S. C.
§811(c)(7)), but must also consider such broad factors as
"[t]he state of current scientific knowledge regarding the
drug or other substance," §811(c)(3), and (most notably)
"[w]hat, if any, risk there is to the public health,"
§811(c)(6). If the latter factor were limited to addiction-

related health risks, as the Court supposes, it would be redundant of §811(c)(7). Moreover, in making registration determinations regarding manufacturers and distributors, the Attorney General "shall" consider "such *other* factors as may be relevant to and consistent with the public health and safety," §§823(a)(6), (b)(5), (d)(6), (e)(5) (emphasis added)—over and above the risk of "diversion" of controlled substances, §§823(a)(1), (a)(5), (b)(1), (d)(1), (d)(5), (e)(1). And, most relevant of all, in registering and deregistering *physicians*, the Attorney General "may deny an application for such registration if he determines that the issuance of such registration would be inconsistent with the public interest," §823(f); see also §824(a)(4), and in making that determination "shall" consider "[s]uch other conduct which may threaten the public health and safety," §823(f)(5). *All* of these provisions, not just those selectively cited by the Court, shed light upon the CSA's repeated references to the undefined term "abuse." See §§811(a)(1)(A), (c)(1), (c)(4), (c)(5); §§812(b)(1)(A), (b)(2)(A), (b)(3)(A), (b)(4)(A), (b)(5)(A).

By disregarding all these public-interest, public-health, and public-safety objectives, and limiting the CSA to "addiction and recreational abuse," the Court rules out the prohibition of anabolic-steroid use for bodybuilding purposes. It seeks to avoid this consequence by invoking the Anabolic Steroids Control Act of 1990, 104 Stat. 4851. *Ante*, at 27. But the only effect of that legislation is to make anabolic steroids controlled drugs under Schedule III of the CSA. If the only *basis* for control is (as the Court says) "addiction and recreational abuse," dispensation of these drugs for bodybuilding could not be proscribed.

Although, as I have described, the Court's opinion no more defers to state law than does the Directive, the Court relies on two provisions for the conclusion that "[t]he structure and operation of the CSA presume and rely upon a functioning medical profession regulated under the

States' police powers," *ante*, at 23—namely the registra-
tion provisions of §823(f) and the nonpre-emption provi-
sion of §903. Reliance on the former is particularly unfor-
tunate, because the Court's own analysis recounts how
Congress amended §823(f) in 1984 in order to *liberate* the
Attorney General's power over registration from the con-
trol of state regulators. See *ante*, at 14; 21 U. S. C. §823(f);
see also Brief for Petitioners 34–35. And the nonpre-
emption clause is embarrassingly inapplicable, since it
merely disclaims field pre-emption, and affirmatively
*prescribes* federal pre-emption whenever state law creates
a conflict.[5] In any event, the Directive does not purport to
pre-empt state law in any way, not even by conflict pre-
emption—unless the Court is under the misimpression
that some States *require* assisted suicide. The Directive
merely interprets the CSA to prohibit, like countless other
federal criminal provisions, conduct that happens not to be
forbidden under state law (or at least the law of the State
of Oregon).

With regard to the CSA's registration provisions, 21
U. S. C. §§823(f), 824(a), the Court argues that the statute
cannot fairly be read to "'hide elephants in mouseholes'"
by delegating to the Attorney General the power to deter-
mine the legitimacy of medical practices in "'vague terms
or ancillary provisions.'" *Ante*, at 20 (quoting *Whitman* v.
*American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001)).
This case bears not the remotest resemblance to *Whitman,*
which held that "Congress . . . does not alter *the funda-
mental details* of a regulatory scheme in vague terms or
ancillary provisions." *Ibid.* (emphasis added). The Attor-
ney General's power to issue regulations against question-

---

[5] Title 21 U. S. C. §903 reads, in relevant part, as follows: "No provi-
sion of this subchapter shall be construed as indicating an intent on the
part of the Congress to occupy the field in which that provision oper-
ates, including criminal penalties, to the exclusion of any State law on
the same subject matter . . . unless there is a positive conflict . . . ."

able uses of controlled substances in no way alters "the fundamental details" of the CSA. I am aware of only four areas in which the Department of Justice has exercised that power to regulate uses of controlled substances *unrelated* to "addiction and recreational abuse" as the Court apparently understands that phrase: assisted suicide, aggressive pain management therapy, anabolic-steroid use, and cosmetic weight-loss therapy. See, *e.g.*, *In re Harline*, 65 Fed. Reg. 5665, 5667 (2000) (weight loss); *In re Tecca*, 62 Fed. Reg. 12842, 12846 (1997) (anabolic steroids); *In re Roth*, 60 Fed. Reg. 62262, 62263, 62267 (1995) (pain management). There is no indication that enforcement in these areas interferes with the prosecution of "drug abuse" as the Court understands it. Unlike in *Whitman*, the Attorney General's *additional* power to address other forms of drug "abuse" does *absolutely nothing* to undermine the central features of this regulatory scheme. Of course it was critical to our analysis in *Whitman* that the language of the provision did not bear the meaning that respondents sought to give it. See 531 U. S., at 465. Here, for the reasons stated above, the provision is most naturally interpreted to incorporate a uniform federal standard for legitimacy of medical practice.[6]

Finally, respondents argue that the Attorney General must defer to state-law judgments about what constitutes legitimate medicine, on the ground that Congress must speak clearly to impose such a uniform federal standard upon the States. But no line of our clear-statement cases

—————

[6] The other case cited by the Court, *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000), is even more obviously inapt. There we relied on the first step of the *Chevron* analysis to determine that Congress had spoken to the precise issue in question, impliedly repealing the grant of jurisdiction on which the FDA relied. 529 U. S., at 160–161. Here, Congress has not expressly or impliedly authorized the practice of assisted suicide, or indeed "spoken directly" to the subject in any way beyond the text of the CSA.

is applicable here. The canon of avoidance does not apply, since the Directive does not push the outer limits of Congress's commerce power, compare *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 172 (2001) (regulation of isolated ponds), with *United States* v. *Sullivan*, 332 U. S. 689, 698 (1948) (regulation of labeling of drugs shipped in interstate commerce), or impinge on a core aspect of state sovereignty, cf. *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985) (sovereign immunity); *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) (qualifications of state government officials). The clear-statement rule based on the presumption against pre-emption does not apply because the Directive does not pre-empt any state law, cf. *id.*, at 456–457; *Rush Prudential HMO, Inc.* v. *Moran*, 536 U. S. 355, 359 (2002). And finally, no clear statement is required on the ground that the Directive intrudes upon an area traditionally reserved exclusively to the States, cf. *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 544 (1994) (state regulation of titles to real property), because the Federal Government has pervasively regulated the dispensation of drugs for over 100 years. See generally Brief for Pro-Life Legal Defense Fund et al. as *Amici Curiae* 3–15. It would be a novel and massive expansion of the clear-statement rule to apply it in a commerce case *not involving pre-emption or constitutional avoidance*, merely because Congress has chosen to prohibit conduct that a State has made a contrary policy judgment to permit. See *Sullivan*, *supra*, at 693.

## III

Even if the Regulation did not exist and "prescription" in §829 could not be interpreted to require a "legitimate medical purpose," the Directive's conclusion that "prescribing, dispensing, or administering federally controlled substances . . . by a physician . . . may 'render his registra-

tion . . . inconsistent with the public interest' and therefore subject to possible suspension or revocation under 21 U. S. C. [§]824(a)(4)," 66 Fed. Reg. 56608, would nevertheless be unassailable in this Court.

Sections 823(f) and 824(a) explicitly grant the Attorney General the authority to register and deregister physicians, and his discretion in exercising that authority is spelled out in very broad terms. He may refuse to register or deregister if he determines that registration is "inconsistent with the public interest," 21 U. S. C. §823(f), after considering five factors, the fifth of which is "[s]uch other conduct which may threaten the public health and safety," §823(f)(5). See also *In re Arora*, 60 Fed. Reg. 4447, 4448 (1995) ("It is well established that these factors are to be considered in the disjunctive, i.e., the Deputy Administrator may properly rely on any one or a combination of factors, and give each factor the weight he deems appropriate"). As the Court points out, these broad standards were enacted in the 1984 amendments for the specific purpose of *freeing* the Attorney General's discretion over registration from the decisions of state authorities. See *ante*, at 13.

The fact that assisted-suicide prescriptions are issued in violation of §829 is of course sufficient to support the Directive's conclusion that issuing them may be cause for deregistration: such prescriptions would violate the fourth factor of §823(f), namely "[c]ompliance with applicable . . . Federal . . . laws relating to controlled substances," 21 U. S. C. §823(f)(4). But the Attorney General did not rely solely on subsection (f)(4) in reaching his conclusion that registration would be "inconsistent with the public interest"; nothing in the text of the Directive indicates that. Subsection (f)(5) ("[s]uch other conduct which may threaten the public health and safety") provides an independent, alternative basis for the Directive's conclusion regarding deregistration—provided that the Attorney General has

authority to interpret "public interest" and "public health and safety" in §823(f) to exclude assisted suicide.

Three considerations make it perfectly clear that the statute confers authority to interpret these phrases upon the Attorney General. First, the Attorney General is solely and explicitly charged with administering the registration and deregistration provisions. See §§823(f), 824(a). By making the criteria for such registration and deregistration such obviously ambiguous factors as "public interest" and "public health and safety," Congress implicitly (but clearly) gave the Attorney General authority to interpret those criteria—*whether or not* there is any explicit delegation provision in the statute. "Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U. S., at 844. The Court's exclusive focus on the *explicit* delegation provisions is, at best, a fossil of our pre-*Chevron* era; at least since *Chevron*, we have not conditioned our deferral to agency interpretations upon the existence of explicit delegation provisions. *United States* v. *Mead Corp.,* 533 U. S. 218, 229 (2001), left this principle of implicit delegation intact.

Second, even if explicit delegation were required, Congress provided it in §821, which authorizes the Attorney General to "promulgate rules and regulations . . . relating to the *registration and control* of the manufacture, distribution, and dispensing of controlled substances . . . ." (Emphasis added.) Because "dispensing" refers to the delivery of a controlled substance "pursuant to the lawful order of, a practitioner," 21 U. S. C. §802(10), the deregistration of such practitioners for writing impermissible orders "relat[es] to the registration . . . of the . . . dispensing" of controlled substances, 21 U. S. C. A. §821 (Supp. 2005).

Third, §821 also gives the Attorney General authority to promulgate rules and regulations "relating to the . . . control of the . . . dispensing of controlled substances." As discussed earlier, it is plain that the *ordinary* meaning of "control" must apply to §821, so that the plain import of the provision is to grant the Attorney General rulemaking authority over all the provisions of part C of the CSA, 21 U. S. C. A. §§821–830 (main ed. and Supp. 2005). Registering and deregistering the practitioners who issue the prescriptions necessary for lawful dispensation of controlled substances plainly "relat[es] to the . . . control of the . . . dispensing of controlled substances." §821 (Supp. 2005).

The Attorney General is thus authorized to promulgate regulations interpreting §§823(f) and 824(a), both by implicit delegation in §823(f) and by two grounds of explicit delegation in §821. The Court nevertheless holds that this triply unambiguous delegation cannot be given full effect because "the design of the statute," *ante*, at 18, evinces the intent to grant the Secretary of Health and Human Services exclusive authority over scientific and medical determinations. This proposition is not remotely plausible. The Court cites as authority for the Secretary's exclusive authority two specific areas in which his medical determinations are said to be binding on the Attorney General—with regard to the "scientific and medical evaluation" of a drug's effects that precedes its scheduling, §811(b), and with regard to "the appropriate methods of professional practice in the medical treatment of the narcotic addiction of various classes of narcotic addicts," 42 U. S. C. §290bb–2a; see also 21 U. S. C. §823(g) (2000 ed. and Supp. II). See *ante*, at 17–19. Far from establishing a general principle of Secretary supremacy with regard to all scientific and medical determinations, the fact that Congress granted the Secretary specifically defined authority in the areas of scheduling and addiction treatment,

*without otherwise mentioning him* in the registration
provisions, suggests, to the contrary, that Congress envi-
sioned *no* role for the Secretary in that area—where, as we
have said, interpretive authority was both implicitly and
explicitly conferred upon the Attorney General.

Even if we could rewrite statutes to accord with sensible
"design," it is far from a certainty that the Secretary,
rather than the Attorney General, ought to control the
registration of physicians. Though registration decisions
sometimes require judgments about the legitimacy of
medical practices, the Department of Justice has seem-
ingly had no difficulty making them. See *In re Harline*, 65
Fed. Reg. 5665; *In re Tecca,* 62 Fed. Reg. 12842; *In re
Roth*, 60 Fed. Reg. 62262. But unlike decisions about
whether a substance should be scheduled or whether a
narcotics addiction treatment is legitimate, registration
decisions are not exclusively, or even primarily, concerned
with "medical [and] scientific" factors. See 21 U. S. C.
§823(f). Rather, the decision to register, or to bring an
action to deregister, an individual *physician* implicates all
the policy goals and competing enforcement priorities that
attend any exercise of prosecutorial discretion. It is en-
tirely reasonable to think (as Congress evidently did) that
it would be easier for the Attorney General occasionally to
make judgments about the legitimacy of medical practices
than it would be for the Secretary to get into the business
of law enforcement. It is, in other words, perfectly consis-
tent with an intelligent "design of the statute" to give the
Nation's chief law enforcement official, not its chief health
official, broad discretion over the substantive standards
that govern registration and deregistration. That is *espe-
cially* true where the contested "scientific and medical"
judgment at issue has to do with the legitimacy of physi-
cian-assisted suicide, which ultimately rests, not on "sci-
ence" or "medicine," but on a naked value judgment. It no
more depends upon a "quintessentially medical judg-

men[t]," *ante*, at 20, than does the legitimacy of polygamy or eugenic infanticide. And it requires no particular *medical* training to undertake the objective inquiry into how the continuing traditions of Western medicine have consistently treated this subject. See OLC Memo, App. to Pet. for Cert. 113a–130a. The Secretary's supposedly superior "medical expertise" to make "medical judgments," *ante*, at 19–20, is strikingly irrelevant to the case at hand.

The Court also reasons that, even if the CSA grants the Attorney General authority to interpret §823(f), the Directive does not purport to exercise that authority, because it "does not undertake the five-factor analysis" of §823(f) and does not "on its face purport to be an *application* of the registration provision in §823(f)." *Ante*, at 14 (emphasis added). This reasoning is sophistic. It would be improper—indeed, *impossible*—for the Attorney General to "undertake the five-factor analysis" of §823(f) and to "appl[y] the registration provision" outside the context of an actual enforcement proceeding. But of course the Attorney General may issue regulations to clarify his interpretation of the five factors, and to signal how he will apply them in future enforcement proceedings. That is what the Directive plainly purports to do by citing §824(a)(4), and that is why the Directive's conclusion on deregistration is couched in conditional terms: "Such conduct by a physician . . . *may* 'render his registration . . . inconsistent with the public interest' and therefore subject to *possible* suspension or revocation under 21 U. S. C. [§]824(a)(4)." 66 Fed. Reg. 56608 (emphasis added).

It follows from what we have said that the Attorney General's authoritative interpretations of "public interest" and "public health and safety" in §823(f) are subject to *Chevron* deference. As noted earlier, the Court does not contest that the absence of notice-and-comment procedures for the Directive renders *Chevron* inapplicable. And there is no serious argument that "Congress has directly

spoken to the precise question at issue," or that the Directive's interpretations of "public health and safety" and "inconsistent with the public interest" are not "permissible." *Chevron*, 467 U. S., at 842–843. On the latter point, in fact, the condemnation of assisted suicide by 50 American jurisdictions supports the Attorney General's view. The Attorney General may therefore weigh a physician's participation in assisted suicide as a factor counseling against his registration, or in favor of deregistration, under §823(f).

In concluding to the contrary, the Court merely presents the conclusory assertion that "it is doubtful the Attorney General could cite the 'public interest' or 'public health' to deregister a physician simply because he deemed a controversial practice permitted by state law to have an illegitimate medical purpose." *Ante*, at 17. But why on earth not?—especially when he has interpreted the relevant statutory factors in advance to give fair warning that such a practice is "inconsistent with the public interest." The Attorney General's discretion to determine the public interest in this area is admittedly broad—but certainly no broader than other congressionally conferred Executive powers that we have upheld in the past. See, *e.g.*, *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 216–217 (1943) ("public interest"); *New York Central Securities Corp.* v. *United States*, 287 U. S. 12, 24–25 (1932) (same); see also *Mistretta* v. *United States*, 488 U. S. 361, 415–416 (1989) (SCALIA, J., dissenting).

* * *

In sum, the Directive's first conclusion—namely that physician-assisted suicide is not a "legitimate medical purpose"—is supported both by the deference we owe to the agency's interpretation of its own regulations and by the deference we owe to its interpretation of the statute. The other two conclusions—(2) that prescribing controlled

drugs to assist suicide violates the CSA, and (3) that such conduct is also "inconsistent with the public interest"—are inevitable consequences of that first conclusion. Moreover, the third conclusion, standing alone, is one that the Attorney General is authorized to make.

The Court's decision today is perhaps driven by a feeling that the subject of assisted suicide is none of the Federal Government's business. It is easy to sympathize with that position. The prohibition or deterrence of assisted suicide is certainly not among the enumerated powers conferred on the United States by the Constitution, and it is within the realm of public morality *(bonos mores)* traditionally addressed by the so-called police power of the States. But then, neither is prohibiting the recreational use of drugs or discouraging drug addiction among the enumerated powers. From an early time in our national history, the Federal Government has used its enumerated powers, such as its power to regulate interstate commerce, for the purpose of protecting public morality—for example, by banning the interstate shipment of lottery tickets, or the interstate transport of women for immoral purposes. See *Hoke* v. *United States*, 227 U. S. 308, 321–323 (1913); *Lottery Case*, 188 U. S. 321, 356 (1903). Unless we are to repudiate a long and well-established principle of our jurisprudence, using the federal commerce power to prevent assisted suicide is unquestionably permissible. The question before us is not whether Congress *can* do this, or even whether Congress *should* do this; but simply whether Congress *has* done this in the CSA. I think there is no doubt that it has. If the term "*legitimate* medical purpose" has any meaning, it surely excludes the prescription of drugs to produce death.

For the above reasons, I respectfully dissent from the judgment of the Court.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–623

_____

## ALBERTO R. GONZALES, ATTORNEY GENERAL, ET AL., PETITIONERS *v.* OREGON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 17, 2006]

JUSTICE THOMAS, dissenting.

When Angel Raich and Diane Monson challenged the application of the Controlled Substances Act (CSA), 21 U. S. C. §801 *et seq.*, to their purely intrastate possession of marijuana for medical use as authorized under California law, a majority of this Court (a mere seven months ago) determined that the CSA effectively invalidated California's law because "the CSA is a comprehensive regulatory regime specifically designed to regulate which controlled substances can be utilized for medicinal purposes, *and in what manner.*" *Gonzales* v. *Raich,* 545 U. S. \_\_\_, \_\_\_ (2005) (slip op., at 24) (emphasis added). The majority employed unambiguous language, concluding that the "manner" in which controlled substances can be utilized "for medicinal purposes" is one of the "core activities regulated by the CSA." *Id.,* at \_\_\_ (slip op., at 25). And, it described the CSA as "creating a comprehensive framework for regulating the production, distribution, and possession of . . . 'controlled substances,'" including those substances that "'have a useful and legitimate medical purpose,'" in order to "foster the beneficial use of those medications" and "to prevent their misuse." *Id.,* at \_\_\_ (slip op., at 21).

Today the majority beats a hasty retreat from these conclusions. Confronted with a regulation that broadly requires all prescriptions to be issued for a "legitimate

medical purpose," 21 CFR §1306.04(a) (2005), a regulation recognized in *Raich* as part of the Federal Government's "closed . . . system" for regulating the "manner" in "which controlled substances can be utilized for medicinal purposes," 545 U. S., at ___, ___ (slip op., at 10, 24), the majority rejects the Attorney General's admittedly "at least reasonable," *ante,* at 26, determination that administering controlled substances to facilitate a patient's death is not a "'legitimate medical purpose.'" The majority does so based on its conclusion that the CSA is only concerned with the regulation of "medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood." *Ante*, at 23. In other words, in stark contrast to *Raich'*s broad conclusions about the scope of the CSA as it pertains to the medicinal use of controlled substances, today this Court concludes that the CSA is merely concerned with fighting "'drug abuse'" and only insofar as that abuse leads to "addiction or abnormal effects on the nervous system."[1] *Ante,* at 26.

The majority's newfound understanding of the CSA as a statute of limited reach is all the more puzzling because it rests upon constitutional principles that the majority of the Court rejected in *Raich*. Notwithstanding the States' "'traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens,'" 545 U. S., at ___, n. 38 (slip op., at 27, n. 38), the *Raich* majority concluded that the CSA applied to the intrastate possession of marijuana for medicinal purposes authorized by California law because "Congress could have rationally" concluded that such an application was necessary to the

—————

[1] The majority does not expressly address whether the ingestion of a quantity of drugs that is sufficient to cause death has an "abnormal effec[t] on the nervous system," *ante*, at 25, though it implicitly rejects such a conclusion.

regulation of the "larger interstate marijuana market." *Id.*, at \_\_\_, \_\_\_ (slip op., at 28, 30). Here, by contrast, the majority's restrictive interpretation of the CSA is based in no small part on "the structure and limitations of federalism, which allow the States '"great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."'" *Ante*, at 23 (quoting *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 475 (1996), in turn quoting *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S. 724, 756 (1985)). According to the majority, these "background principles of our federal system . . . belie the notion that Congress would use . . . an obscure grant of authority to regulate areas traditionally supervised by the States' police power." *Ante,* at 28.

Of course there is nothing "obscure" about the CSA's grant of authority to the Attorney General. *Ante*, p. \_\_\_ (SCALIA, J., dissenting). And, the Attorney General's conclusion that the CSA prohibits the States from authorizing physician assisted suicide is admittedly "at least reasonable," *ante*, at 26 (opinion of the Court), and is therefore entitled to deference. *Ante,* at 6–7 (SCALIA, J., dissenting). While the scope of the CSA and the Attorney General's power thereunder are sweeping, and perhaps troubling, such expansive federal legislation and broad grants of authority to administrative agencies are merely the inevitable and inexorable consequence of this Court's Commerce Clause and separation-of-powers jurisprudence. See, *e.g.*, *Raich*, *supra; Whitman* v. *American Trucking Assns., Inc.,* 531 U. S. 457 (2001).

I agree with limiting the applications of the CSA in a manner consistent with the principles of federalism and our constitutional structure. *Raich*, *supra,* at \_\_\_ (THOMAS, J., dissenting); cf. *Whitman, supra*, at 486–487 (THOMAS, J., concurring) (noting constitutional concerns with broad delegations of authority to administrative agencies). But that is now water over the dam. The rele-

vance of such considerations was at its zenith in *Raich*, when we considered whether the CSA could be applied to the intrastate possession of a controlled substance consistent with the limited federal powers enumerated by the Constitution. Such considerations have little, if any, relevance where, as here, we are merely presented with a question of statutory interpretation, and not the extent of constitutionally permissible federal power. This is particularly true where, as here, we are interpreting broad, straightforward language within a statutory framework that a majority of this Court has concluded is so comprehensive that it necessarily nullifies the States' "'traditional . . . powers . . . to protect the health, safety, and welfare of their citizens.'"[2] *Raich*, *supra,* at ___, n. 38 (slip op., at 27, n. 38). The Court's reliance upon the constitutional principles that it rejected in *Raich*—albeit under the guise of statutory interpretation—is perplexing to say the least. Accordingly, I respectfully dissent.

———————

[2]Notably, respondents have not seriously pressed a constitutional claim here, conceding at oral argument that their "point is not necessarily that [the CSA] would be unconstitutional." Tr. of Oral Arg. 44. In any event, to the extent respondents do present a constitutional claim, they do so solely within the framework of *Raich*. Framed in this manner, the claim must fail. The respondents in *Raich* were "local growers and users of state-authorized, medical marijuana," who stood "outside the interstate drug market" and possessed "'medicinal marijuana . . . not intended for . . . the stream of commerce.'" 545 U. S., at ___, ___, (slip op., at 5, 16) (THOMAS, J., dissenting). Here, by contrast, the respondent-physicians are active participants in the interstate controlled substances market, and the drugs they prescribe for assisting suicide have likely traveled in interstate commerce. If the respondents in *Raich* could not sustain a constitutional claim, then *a fortiori* respondents here cannot sustain one. Respondents' acceptance of *Raich* forecloses their constitutional challenge.